```
 1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA      )
                                   )
 4        v.                       )   Docket No. 5:22-cr-00461-JKP-1
                                   )
 5   ALEJANDRO RICHARD VELASQUEZ   )   San Antonio, Texas
     GOMEZ,                        )   August 16, 2022
 6        Defendant.               )
     _____)
 7
          TRANSCRIPT OF PRELIMINARY HEARING AND DETENTION HEARING
 8             BEFORE THE HONORABLE RICHARD B. FARRER
                  UNITED STATES MAGISTRATE JUDGE
 9
     A P P E A R A N C E S:
10
     FOR THE GOVERNMENT:
11   Kelly Griffith Stephenson
     United States Attorney's Office
12   601 NW Loop 410, Suite 600
     San Antonio, TX 78216
13
     FOR THE DEFENDANT:
14   Molly Lizbeth Roth
     Federal Public Defender's Office
15   727 E. Cesar E. Chavez Blvd., Room B-207
     San Antonio, TX 78206-1205
16
     COURT RECORDER:  FTR Gold
17
     Proceedings reported by electronic sound recording.  Transcript
18   produced by computer-aided transcription.

19

20

21

22

23

24

25
```

INDEX

PAGE

FREDDIE MILLER

Direct Examination by Mr. Stephenson ......................5

Cross-Examination by Ms. Roth ..........................25

1          *(10:40 a.m.)*

2                THE CLERK:  United States of America v. Alejandro

3    Richard Velasquez Gomez, SA:22-MJ-1210.

4                THE COURT:  Counsel, your appearances, please.

5                MR. STEPHENSON:  Good morning, Your Honor.  Kelly

6    Stephenson on behalf of the United States.

7                MS. ROTH:  Good morning.  Molly Roth for Alejandro

8    Velasquez.

9                THE COURT:  Good morning to you both.

10        Ms. Roth, I have you set on the calendar for a preliminary

11   hearing and detention hearing.  Are we proceeding with both?

12                MS. ROTH:  We are, Your Honor.

13                THE COURT:  Okay.  Let me just note for the record

14   that in accordance with Federal Rule of Criminal Procedure 5(f)

15   and the Due Process Protections Act the government is hereby

16   notified of and ordered to comply with the prosecutor's

17   disclosure obligations under *Brady v. Maryland* and its progeny.

18        The government is further notified of the possible

19   consequences of violating this order or those obligations,

20   which may include delay of trial or other proceedings,

21   exclusion of evidence, giving of adverse jury instructions,

22   grant of a new trial, dismissal of the action or a finding of

23   contempt.

24        Mr. Gomez, we're here first to address the preliminary

25   hearing, which is a probable cause hearing.  You've been

charged by way of a criminal complaint -- that's the charging document -- with two offenses.

The first is threatening interstate communications, in violation of Title 18 of United States Code Section 875(c).

The second is possession of child pornography, in violation of Title 18, United States Code, Section 2252A(a)(5)(B).

So the first part of this hearing will be a probable cause hearing to determine whether there's probable cause to believe an offense has been committed and the defendant committed it. If there is a finding of probable cause, I'll order that you be held over and answer to those charges in the district court. And then we'll move on to the question of your release on bond and whether and to what extent that is available to you in this case.

Why don't I turn things over to Mr. Stephenson with the government for the government's case on probable cause. If you'd like to introduce evidence that informs the detention issue as well, that's fine with me, as long as there's no objection from Ms. Roth.

MS. ROTH: No objection, Your Honor.

THE COURT: Okay. And that -- we can do that just to streamline things.

Why don't you go ahead, Mr. Stephenson.

MR. STEPHENSON: Absolutely. The government calls Agent Miller.

1    *(The oath was administered)*

2          THE CLERK:  You may be seated.

3          FREDDIE MILLER, GOVERNMENT'S WITNESS, SWORN

4                    DIRECT EXAMINATION

5    BY MR. STEPHENSON:

6    Q.  Good morning, Agent Miller.  Can you provide your full name

7    for the record, please.

8    A.  Freddie Charles Miller.

9    Q.  And how are you employed?

10   A.  I'm a special agent with Homeland Security Investigations,

11   and I am assigned presently as a task force officer at the FBI.

12   Q.  And can you tell me which task force you're assigned to?

13   A.  I'm assigned to the JTTF, the Joint Terrorism Task Force,

14   specifically the Domestic Terrorism Squad.

15   Q.  And can you describe just very briefly your experience and

16   qualifications as it relates to domestic terrorism.

17   A.  Absolutely.  I have been assigned to the FBI Domestic

18   Terrorism Squad for approximately eight months.  In those eight

19   months I've had the opportunity to participate in

20   investigations related to a variety of domestic terrorism

21   issues, anything from individuals who are –– who are inclining

22   themselves towards mass shootings or threatening communications

23   over the internet.

24   Q.  And have you received specialized training?

25   A.  I have received, throughout my career, a variety of

1  training and have recently also attended JTTF training.

2  Q.  And do you also have experience or training relevant to

3  child pornography investigations?

4  A.  I do.  Yes, sir.

5  Q.  Can you briefly describe that for me as well?

6  A.  Absolutely.  As a Homeland Security Investigations special

7  agent, I was assigned to the Child Exploitation Unit for 12

8  years.  And during those 12 years I had the opportunity to

9  investigate these types of crimes.

10  Q.  Okay.  And "these types of crimes" being child pornography?

11  A.  Yes, sir.

12  Q.  Okay.  And are you familiar with the criminal complaint for

13  arrest in this case?

14  A.  I am.

15       MR. STEPHENSON:  Your Honor, may I approach and

16  provide a copy of the complaint?

17       THE COURT:  Yes, you may.

18  BY MR. STEPHENSON:

19  Q.  I'd like to talk to you first about the parts of this

20  complaint that deal with the threat case, the 875(c).  Can you

21  describe for me when that threat was made?

22       MS. ROTH:  Your Honor, I'm sorry.  I note that this is

23  public record, the affidavit to the complaint.  But it's not

24  written or sworn out by this witness.  And so if -- I would at

25  least like to hear more about the relationship about why we're

1    testifying from a probable cause affidavit instead of just his

2    personal knowledge and what's --

3            THE COURT:  Okay.

4            MS. ROTH:  We all have the complaint to be read before

5    us, but we're hearing testimony about that and about the

6    underlying facts.  And so it's odd that this witness would be

7    handed a copy of the complaint to refer to, when it's not

8    written by this witness.

9            THE COURT:  Okay.  Well, why don't you lay your

10   foundation, Mr. Stephenson.  And, obviously, we're interested

11   in eliciting testimony of the witness's, you know, personal

12   knowledge.

13           MR. STEPHENSON:  Understood, Your Honor.  I'm not

14   intending to call him to read -- have him read the complaint.

15           THE COURT:  Great.  Thanks.

16   BY MR. STEPHENSON:

17   Q.   How are you familiar with this complaint?

18   A.   I am a member of the DT Squad at the FBI, and I have worked

19   very closely with all of the agents that have been involved

20   with this investigation.

21   Q.   Prior to this complaint, had you worked on the search

22   warrants that preceded this complaint -- or the investigation

23   that was part of those search warrants?

24   A.   I did work on the investigation that led up to the -- to

25   the issuance of the search warrant --

1  Q.  Okay.

2  A.  -- on this investigation.

3  Q.  So were you involved in this case prior to this complaint

4  being filed?

5  A.  I was.

6  Q.  Did you contribute any information that you think was --

7  formed the basis of this complaint?

8  A.  Absolutely.  I participated in investigative research and

9  surveillance, and I did have a role.  Absolutely.

10  Q.  Okay.  In addition, have you spoken to the affiant for this

11  complaint?

12  A.  Yes.

13  Q.  In detail or just passing conversation?

14  A.  We have collaborated throughout this entire investigation.

15        MR. STEPHENSON:  Okay.  Ms. Roth, any -- may I

16  continue?

17        MS. ROTH:  That's --

18        THE COURT:  Seems okay.

19        MS. ROTH:  That's the Court's call.  But I -- thank

20  you -- I appreciate that.  I don't have an objection for

21  purposes of this --

22        THE COURT:  Yeah.  I think he's laid the

23  foundation you were looking for.

24        MS. ROTH:  Yes.  Thank you.

25

BY MR. STEPHENSON:

Q.  Okay.  Let me ask again.  So we're talking about the
events.  When was the -- when was the threat described in this
complaint made?

A.  On July 18th, 2022, an Instagram post was posted by a user
identified as the LatinoZoomer.  And the law enforcement became
aware of this post on the following day, July the 19th, 2022,
of this year.

Q.  And can you describe for me the content of the post?

A.  Absolutely.  The post depicts a picture of a young man.  We
know this young man to be Mr. Velasquez.  And the text of the
post reads, at the very top, "LatinoZoomer."  And it reads,
"Hi.  LatinoZoomer here.  July 22nd is the day of retribution,
the day I will have revenge against all humanity, which all of
you will pay for my suffering.  SAS will be the turning point
of the LatinoZoomer lore."

     And then it concludes with an emoji of a pistol, a handgun
and three like huffing or angry faces.

Q.  And I'm going to ask you some more questions about the
contents of that post.  But, first, how do you know that this
post was made by the defendant, Mr. Velasquez?

A.  Well, as soon as this post became -- as soon as law
enforcement became aware of this post, law enforcement
immediately began to conduct law enforcement queries.  We --
law enforcement FBI also contacted Instagram where this post

1  was made.  And as a result of an emergency disclosure request,

2  Instagram was able to provide identifiers, which led and

3  directed law enforcement to the identity of the LatinoZoomer,

4  which is, in fact, Alejandro Velasquez.

5  Q.  And fast-forwarding a little bit in time, did law

6  enforcement ever have a chance to confirm whether Mr. Velasquez

7  made this with him, with Mr. Velasquez himself?

8  A.  Yes, sir.

9  Q.  And what was the -- what was the conclusion?

10  A.  During an interview with Mr. Velasquez, he himself stated

11  that he made this post.

12  Q.  Okay.  I'd like to refer back -- when you were reading the

13  post, you put emphasis on a few words, "retribution,"

14  "revenge," things like that.  Can you tell me, what is the

15  significance of those -- of those words that you emphasized?

16  A.  Absolutely.  Based on my conversations, my reading of law

17  enforcement reports and, once again, discussions with other law

18  enforcement officers, I was able to recognize those particular

19  words as being a message -- a reflection of a message that was

20  posted by incel mass shooter Elliot Rodger.

21  Q.  And can you tell me, what is an incel?

22  A.  An incel is a subset, a subculture of domestic violence

23  extremism.  Incel is an abbreviation for involuntary celibate.

24  And basically this subset of individuals base their ideology on

25  frustration with their inability to obtain and maintain

1  relationships with the opposite sex, in other words, unable to

2  establish relationships with women, with girls.

3       And the ideology is really fueled by these individuals'

4  hatred towards women.  They have very misogynistic attitudes

5  towards women and are very much wanting to exert their power,

6  their control, their influence over women.

7  Q.  And to your knowledge has the defendant ever

8  self-identified as an incel?

9  A.  He has.

10  Q.  And what's your basis for that?

11  A.  As a result of the review of evidence obtained in this

12  investigation, I observed where the LatinoZoomer -- he

13  describes himself with a variety of words, and one of those

14  being incel.

15  Q.  And a reminder, LatinoZoomer is the defendant,

16  Mr. Velasquez?

17  A.  It is.  Yes, sir, he is.

18  Q.  And you also mentioned Elliot Rodger.  What's the

19  significance of Elliot Rodger?

20  A.  Elliot Rodger was a mass shooter.  He committed a terror

21  attack in 2014, in which six individuals -- six individuals

22  were killed and 14 injured as a result of shooting, stabbing

23  and ramming with cars.  At the very end of his terroristic

24  crime spree, he killed himself.

25  Q.  And what is the connection between Elliot Rodger and

1  incels?

2  A.  Well, Elliot Rodger has -- as a result of that -- of that

3  terroristic event, he has become an icon, an avatar of the

4  incel ideology.

5  Q.  And so in the context of this -- of this post, how do you

6  interpret -- at a high level how do you view this post as a

7  threat?

8  A.  During the Elliot Rodger attack he paused and created a

9  video, which he uploaded onto the internet.  He titled it,

10  "Elliot Rodger Retribution."  And in this video he makes the

11  following statement.  He says, "Tomorrow is the day of

12  retribution, the day in which I will have my revenge against

13  humanity, against all of you."

14      And so there's keywords in that Elliot Rodger' statement

15  that are a reflection of the words in the LatinoZoomer post,

16  which was posted by Mr. Velasquez.

17  Q.  Understood.

18      So in that context what do you see this post to be

19  threatening specifically?

20  A.  Violence at a particular conference, the SAS conference,

21  which was two days following the date of this post.

22  Q.  Okay.  Understood.

23      And as to the SAS conference, what is the SAS conference to

24  your knowledge?

25  A.  SAS stands for Student Action Summit.  It's a conference

1  that is sponsored by the Turning Point USA group.  It's a

2  conference which -- the focal point is politics.  There are

3  various speakers who present.  And attendees for the most part

4  range -- the SAS attracts, for the most part, a younger crowd,

5  anywhere between the ages of 16, 17, all the way maybe to the

6  mid 20s.  But that's who specifically this conference attracts,

7  the SAS conference.

8  Q.  And I apologize if you said this already.  Is that -- was

9  that conference held in Texas or somewhere else?

10 A.  The conference was held in Tampa, Florida, on July 22nd

11 through the 24th of this year.

12 Q.  And do you know if anyone associated with that conference

13 received this threat?

14 A.  Yes.

15 Q.  And how do you know that?

16 A.  The FBI contacted SAS to advise them of this threat, and

17 SAS personnel advised the FBI that they were already aware that

18 their social media liaison individuals, that are associated

19 with SAS, that they had become aware of the threat.  And they

20 themselves had already contacted the police in Tampa as well as

21 San Antonio Police Department here in San Antonio, Texas.

22 Q.  Okay.  Understood.

23     And in addition, did you learn anything else about the

24 defendant's connections to SAS?

25 A.  Yes.  Through our law -- as a way -- by way of our

1    investigation, law enforcement learned that Mr. Velasquez had

2    obtained his ticket to attend the conference, he had already

3    obtained that, and that he had already purchased tickets --

4    round-trip tickets from Austin, Texas, to Tampa Bay, Florida,

5    in order to attend the conference.  In addition, our

6    investigation revealed images of Mr. Velasquez holding his pass

7    to the conference.

8    Q.  Okay.  And that was -- so just to be clear, a plane ticket

9    to fly from Austin to Tampa?

10   A.  Yes, sir.

11   Q.  Okay.  And did you learn what, if any, actions SAS took?

12   You mentioned that they called -- that they notified law

13   enforcement.  Any additional actions that they took?

14   A.  Yes.  Absolutely.  SAS, as a result of the perceived threat

15   on their part and in addition to contacting law enforcement,

16   they canceled Mr. Velasquez's ticket to attend the conference.

17   Q.  Okay.  And I want to ask questions about how others --

18   we've talked a little bit about how SAS viewed this threat when

19   they received it.  Can you tell me how any others who viewed

20   his post might have viewed it --

21   A.  Absolutely.

22   Q.  -- contemporaneously?

23   A.  Absolutely.  So after the post was made by Mr. Velasquez,

24   the post in which he indicates the day of his retribution --

25   subsequent to that, individuals posted comments.  And one

1  individual advised Mr. Velasquez that he had alerted the FBI.

2  Q.  Understood.

3      And lastly on this -- on this particular topic, do you --

4  do you have a way of knowing what the defendant -- or some of

5  what the defendant might have known about Elliot Rodger and the

6  significance of Elliot Rodger at the time?

7  A.  Yes, sir.

8  Q.  Can you describe that to me?

9  A.  Absolutely.  As a result of the investigation and the

10  review of evidence that was obtained from a cellphone that was

11  seized from him, law enforcement was able to identify numerous

12  searches on the phone for Elliot Rodgers, picture -- searches

13  for an Elliot Rodgers manifesto, which was the manifesto that I

14  just -- that I read earlier.

15      There were searches -- there were searches for the victims.

16  There was various images of Elliot Rodgers that were contained

17  on the phone, to include an app image -- it's a face-merging

18  app in which one can take the face of one individual and then

19  the face of another individual and merge them, to see what they

20  would look like combined, the end result.

21      And there is -- we did find an image of Elliot Rodger in

22  one window, next to a window image of Mr. Velasquez, with, down

23  below, a third image, their faces combined, what a combination

24  of Elliot Rodger and Alejandro Velasquez would look like.

25  Q.  And so in sum on that point, how would you describe the

1  defendant's familiarity with Elliot Rodger?

2  A.   He very much associated and related himself to Elliot

3  Rodger and the incel cause and ideology.

4  Q.   Okay.   Thank you.

5      I'm going to move now to talk (inaudible) more about the

6  charges involving child pornography.

7  A.   Okay.

8  Q.   Let me ask, how did -- how did law enforcement come to

9  obtain the defendant's cellphone?

10  A.   At the time of the -- of the interview, which occurred on

11  July 22nd, in the morning, law enforcement had a search warrant

12  for Mr. Velasquez's home, specifically for electronic devices,

13  in this case a cellphone.

14      At the time of the execution of the search warrant, law

15  enforcement sat down with Mr. Velasquez in order to discuss

16  these matters with him.   He provided a statement.   As part of

17  that statement he advised that the phone that he had in his

18  custody was, in fact, his cellphone, which was password

19  protected.   He unlocked it for law enforcement and turned it

20  over to FBI agents.

21  Q.   And so are you confident that the phone that you reviewed

22  in this investigation is, in fact, his cellphone?

23  A.   Yes, sir.   That exact same -- that very same cellphone was

24  then transported to FBI offices, and a mirror image was made of

25  the contents of the phone.

Q. And have you had occasion to review the contents of that phone?

A. I have.

Q. And can you describe some of the relevant findings?

A. Absolutely. On that phone I have observed multiple self-descriptions from Mr. Velasquez comparing himself to a groomer. He has the online persona of LatinoZoomer, but he also created a sub-persona of an individual that he himself called and identified as the LatinoGroomer.

Q. I'll come back to that. But let me first -- were there images on that phone that formed the basis of this complaint?

A. Yes, sir. Absolutely.

Q. Have you yourself personally seen those images?

A. I have.

Q. At a very high level, can you --

MR. STEPHENSON: Your Honor, I would -- I can have him read the description of the images into the record. I believe the Court has the complaint. I can forgo reading that into the record if that's okay with the Court and defense.

THE COURT: That's fine with me.

Ms. Roth, do you have any objection to that?

MS. ROTH: No. I would prefer that. We all have a copy of the complaint.

THE COURT: Okay. And I have the complaint here up on the bench with me. So --

1    MR. STEPHENSON:  Okay.  Thank you, Your Honor.

2    And thank you, defense.

3 BY MR. STEPHENSON:

4 Q.  Let me just ask, at a high level, the images that form the

5 basis of this complaint, do you have any doubt that they are,

6 in fact, children or minors?

7 A.  Based on my experience investigating child exploitation

8 cases, I know -- I know these to be children.  But I know,

9 based on the ages of the children depicted in these images of

10 child exploitation, that any reasonable person would be able to

11 ascertain that, in fact -- that these images depict the sexual

12 abuse of minors.

13 Q.  And so just an age range -- without describing in detail

14 the images, what age range of children are we talking about

15 here?

16 A.  Prepubescent, from two to five.

17 Q.  Okay.  And as to whether or not the images are images of

18 pornography or child pornography, any doubt, based on your 12

19 years of experience, that these are child pornography -- that

20 these images constitute child pornography?

21 A.  They are 100 percent child pornography.

22 Q.  And without -- again, without asking you to get into

23 detail, any doubt that they contain sexually explicit conduct?

24 Are there -- are there genitals visible?

25 A.  They are.

1 Q.  Are there children's genitals visible?

2 A.  Yes.

3 Q.  Are there adults' genitals visible?

4 A.  Yes.

5 Q.  Okay.  That's all I have on that level of detail for that

6 topic.

7     And do you have any insight, based on your review, as to

8 how these images might have gotten onto his phone?

9 A.  Based on what -- the evidence I've reviewed, they're

10 screenshots.

11 Q.  And what is the significance of a screenshot?

12 A.  A screenshot is an image that appears on a cellphone.  And

13 on various devices there is options to take a capture, a still

14 capture of what is on the screen of a phone.  In this case what

15 I observed was a screenshot capture, a color picture of the

16 contents of the face of the phone.

17 Q.  And in your experience what does that tell you about where

18 he might have obtained these images?

19 A.  From the internet.

20 Q.  Okay.  And --

21 A.  Yes.

22 Q.  -- in your experience, training is internet a conduit of

23 commerce?

24 A.  Yes, sir.

25          MR. STEPHENSON:  Okay.  Your Honor, I'm going to

1  direct the remainder of my questions to the issues I think that
2  more closely focus on dangerousness to the community, unless we
3  want to bifurcate.  Happy to do it now.
4        THE COURT:  Why don't you proceed.  And if Ms. Roth
5  would prefer to do it a different way, I'm sure she'll let us
6  know.
7        MS. ROTH:  No objection, Your Honor.
8  BY MR. STEPHENSON:
9  Q.  Okay.  Let me ask, who else lives in the home with
10 Mr. Velasquez?
11 A.  I'm aware of his father, his mother and a 12-year-old
12 sister.
13 Q.  And how -- the 12-year-old sister, can you tell me, has the
14 defendant ever expressed any sexual preferences for young
15 females?
16 A.  Yes.  As I have reviewed the contents of the phone, whether
17 they be screen captures or the images on the phone, texts,
18 chats, I've observed where Mr. Velasquez, as he's chatting, as
19 he's talking to people, he's indicating that he is a groomer;
20 that he has -- he self-describes himself as a groomer; that he
21 has interest in 13-, 14-, 15-year-old girls.  He even describes
22 himself in one of the -- one of the chats as he himself looking
23 younger than 18, thereby giving him access to these types of --
24 these children, these youth.
25 Q.  Can you just describe a little bit more what you mean by

1  "groomer"?  What does that term mean?

2  A.  Yes.  A groomer is a term in which an individual, whether

3  it's online or in person, is preparing a child for a sexual

4  relationship.

5  Q.  And we'll come back to that in a little bit more detail.

6  But let me also ask, is there -- in addition to the 12-year-old

7  sister, are there any other -- does the defendant have any

8  other access to young children based on his current residence?

9  A.  He does.

10  Q.  Can you describe that to me?

11  A.  Absolutely.  Mr. Velasquez's home, the street backs up to

12  an elementary school.  As the crow flies, his front door is 40

13  yards from the back of the school.

14  Q.  Okay.  And you said that was an elementary school?

15  A.  That is an elementary school.

16  Q.  And let me ask, returning back to the -- to the groomer,

17  have you seen any memes or selfies that tell you more about his

18  self-identification as a groomer?

19  A.  Absolutely.  There's multiple.  But two that pop into my

20  mind at this very moment are a meme in which -- and it's a

21  two-window meme.  At the top is a picture, and it reads,

22  PetSmart -- I paraphrase -- I'm paraphrasing this.  PetSmart is

23  looking for experienced groomers.

24      The second window of this meme contains an image of

25  Mr. Velasquez holding his hands up.  And he's -- and he's

1  stating, I paraphrase, That sounds like the perfect job for me.

2    And I'm aware -- I recollect another image.  And this is

3  actually a selfie taken by Mr. Velasquez.  A selfie is an image

4  that is taken with one's own cellphone.  And from the -- from

5  the direction and the angle, I can tell that Mr. Velasquez is

6  holding the phone out.  His face is on one side of -- is

7  depicted on one side of the image.  And in the background are

8  three children, elementary school age children, wearing

9  backpacks.  They're standing in front of a sign that reads

10  Candlewood Elementary School.

11  Q.  And is that the elementary school that's adjacent to his

12  house?

13  A.  It's the very same.

14  Q.  Okay.

15  A.  And the name of that particular TikTok selfie is called

16  "LatinoGroomer Moment."

17  Q.  And let me ask, are you aware of any -- outside of this

18  particular case, are you aware of any other complaints

19  involving similar issues involving this defendant?

20  A.  Yes, sir.

21  Q.  Can you describe that to me?

22  A.  Sure.  Earlier this year, in May, the FBI received a tip in

23  which the LatinoZoomer had solicited -- online solicited a

24  child, a 13-year-old child.

25  Q.  Without going into graphic detail, can you describe to me

1  what that solicitation involved?

2  A.  Absolutely.  There's an image, and it's an image that is

3  focused on the groin area of a male.  There's an erect penis, a

4  hand holding the penis.  In the background is some tiling and a

5  wall that is colored blue, along with some trim.

6  Q.  Did you recognize that background from anything?

7  A.  I do.

8  Q.  What was it?

9  A.  That background -- I had opportunity to go to the house on

10  a subsequent search warrant.  And I located the bathroom of

11  that -- of the residence.  And that very same tile and wall and

12  trim is the very same that's depicted in that image.

13      The conversation in that image, continuing on the post, and

14  I paraphrase, the LatinoZoomer says, Mr. Velasquez, Suck this,

15  referring to the penis.

16      And the response is, I can't.  I'm not 18 years old yet.

17      And then the response to that is, Wow.  I paraphrase once

18  again.  That's a long time from now.

19  Q.  Okay.  Understood.

20      And let me ask, in the course of your investigation have

21  you and law enforcement had occasion to interact with

22  Mr. Velasquez's parents?

23  A.  Yes.

24  Q.  And can you describe those interactions?

25  A.  Yes.  I've had -- the Velasquez home is a home in which the

1  father is a very hard-working man and spends a lot of time
2  working outside the home, making a living for his family.  The
3  mother is a stay-at-home mom.  She may work from the home, but
4  she stays home primarily.  Mr. Velasquez is in the construction
5  or painting, handyman-type business and, of course, is out
6  working many hours, providing for his family.
7       Mrs. Velasquez, as I mentioned, stays at home.  And I mean
8  no disrespect to Mrs. Velasquez whatsoever.  But she -- despite
9  the fact that she is a stay-at-home mother, she has a lot on
10 her plate and is -- by the disarray of the home, it is very
11 evident and obvious that she has a lot going on.  She's not
12 able to upkeep and maintain the home.
13 Q.  Were you able to view any communications between the
14 defendant and his mother when you looked at his phone?
15 A.  Yes.
16 Q.  How would you characterize those communications?
17 A.  I was advised by other agents, as they were view -- were
18 viewing texts and chats, that they had observed a conversation
19 between mom and dad in which Mr. Velasquez is very, very
20 disrespectful of his mother and very commanding and demanding
21 on her.  And just the context of the -- of the chats and the
22 discussions, they depict a young man who's very much in control
23 of and even looking down and being disrespectful to his mother.
24 Q.  Does he appear to listen to the directions or rules that
25 she provides for him?

1  A.  No.

2        MR. STEPHENSON:  Okay.  Your Honor, I pass the

3  witness.

4        MS. ROTH:  May I have one moment to speak with my

5  client?

6        THE COURT:  Yes.

7     *(Discussion off the record)*

8                 CROSS-EXAMINATION

9  BY MS. ROTH:

10 Q.  Agent Miller, if we could start where you just left off.

11 You talked about disrespectful evidence found on the phone?

12 A.  Yes, ma'am.

13 Q.  You didn't observe any communications between Mr. Velasquez

14 and his mother, correct?

15 A.  No.

16 Q.  So the messages that you were referencing were texts to

17 other people?

18 A.  They were -- they were texts that were sent from mom --

19 from his mother to himself.  I recollect one specifically in

20 which mother is asking Mr. Velasquez, Alejandro, to clean his

21 room, and he's responding in a very disrespectful manner.

22     I remember -- I'm aware of another text conversation that

23 they exchanged between themselves.  It was after 10:00 at

24 night.  And the text message was to the effect, I'm hungry.

25 Make me food right now, in a very demanding manner.

1  Q.  And those were texts between whom?

2  A.  Mother -- Mr. Velasquez's mother and himself.

3  Q.  While in the same house?

4  A.  Yes.  That is the impression that I get, as maybe like

5  talking from room to room.

6  One of the things that -- I had an opportunity to visit

7  with Mr. Velasquez's mother and just talk to her.  And one of

8  the things that she advised me with regards to her inability to

9  control Mr. Velasquez's -- his addiction to phones and

10  electronic devices, that she will try to talk to him, and he

11  will be eating -- for example, eating breakfast.  And he can't

12  put the phone down and answer -- have a conversation,

13  discussion with him; that he is completely absorbed into

14  this -- into his electronics, into his phone.  She cannot have

15  him put it down; that he is constantly on his computer.

16  And when we -- when law enforcement -- at the time of the

17  initial meeting between law enforcement and Mr. Velasquez at

18  the home, Mrs. Velasquez and Alejandro were present, and father

19  was away.  He was at the worksite.

20  And when agents approached Mr. Velasquez, Mr. Velasquez

21  right away said, Is this about the computers?  Is this about

22  the electronics?

23  He knew himself.  So the parents had a very difficult time

24  getting Mr. Velasquez to pull himself away from his electronic

25  devices.

1 Q.  How many electronic devices does he have?

2 A.  There are numerous in the home.  I -- as I spoke with

3 Mrs. Velasquez, I had her -- we went through each electronic

4 device, various laptops and phones that were present in the

5 house.  There were numerous.

6     And she advised -- she pointed out the picture -- excuse

7 me -- the computer that Mr. Velasquez used primarily, which was

8 a desktop computer, that was situated on a desk with a

9 gaming -- kind of a gamer-style chair was pulled up to that.

10 We went through all the other electronic devices.

11     The only other computer that she indicated that

12 Mr. Velasquez had approached -- or had access to was a laptop

13 computer that was issued by a local college.  The rest, she

14 said he -- either they were nonoperational or that he did not

15 have access to those computers.  They were mom's computers and

16 -- or the sister's electronic device, and they were password

17 protected.

18 Q.  So how many items did you seize?

19 A.  I am aware of the seizure of the cellphone and of the

20 desktop computer.  And there were -- there were additional

21 devices.  I'm not certain as far as the number.  I did not

22 review the inventory.  I have not had the opportunity to review

23 that.  But I know we seized the computer that he had primary

24 access to, that he used primarily, and, of course, his

25 cellphone.

1  Q.  And are the forensics finished on those devices?

2  A.  No.

3  Q.  Thus far, alleged child pornography has been found only on

4  the cellphone, correct?

5  A.  So far, yes, ma'am.

6  Q.  How many images were found?

7  A.  I personally identified three images on the cellphone.

8  Q.  Okay.  And you said those were selfies?

9  A.  No.

10  Q.  I'm sorry.  Excuse me.  Screenshots.

11  A.  Screenshots.

12  Q.  You said they were screenshots.

13  A.  They appear to be screenshots to me, yes.

14     One of those is a chat.  The reason I know that it's from

15  the internet and it's a screenshot is one of those is a chat.

16  And it contains -- depicted on that -- on that image are three

17  windows.  And they have, of course, the three images of the

18  sexual exploitation of these minors.  And up above is the name

19  of another user.  So that's how I can tell it was part of a

20  chat.

21  Q.  Okay.  But you don't know -- what has forensics shown about

22  those screenshots as far as where they came from?

23  A.  Forensics has not been completed on the phone yet.  Those

24  are images that I identified that were on the phone.

25  Q.  Right.  But there were no corresponding internet searches

1    on that phone, correct?  In other words, you didn't find an

2    internet search that linked to the screenshot?

3    A.  So forensics has not been done.  All I'm able to view is

4    the actual images themselves.  So the forensics will be able to

5    ascertain how the images were obtained, where they were

6    obtained from.  That's not where I'm at on this -- on my

7    identification of the images.  That has not been determined

8    yet.

9    Q.  Okay.  Earlier you talked about looking at past internet

10   searches, after you -- when you were looking at the phone.

11   A.  Yes.

12   Q.  And there were no internet searches that you found relating

13   to child pornography.

14   A.  I saw a search -- a Google search, screenshot Google search

15   for pedophilia.  I saw a screenshot of a -- of a search for

16   legal age of consent in different countries, legal age of

17   consent in various states.  I remember specifically 14 years

18   old being one of the results of that -- of that search -- that

19   screenshot for that search.

20        I do remember a screenshot -- I don't know why, but he

21   would take screenshots -- a screenshot for a search for

22   indecent exposure.

23   Q.  Like a legal definition, you mean?

24   A.  Well, so if you can imagine like you're on your phone,

25   you're going to do a Google search.  And you'll see the Google

1  banner up above, and then you'll see the search bar.  So inside

2  the search bar, the term "pedophilia" and then the results down

3  below.

4       So I'll see the search bar and then like "indecent

5  exposure" and then the results down below; a search for "age of

6  consent" and then the results down below.

7  Q.  And these are all screenshots?

8  A.  They are.

9  Q.  When you looked through the search history on the phone,

10 like you were talking about -- your investigation on the other

11 issue here, the investigation into the threat issue, you didn't

12 find any searches themselves on that phone?  I understand what

13 you're saying about the screenshots.  But you didn't find any

14 search history related to child pornography, correct?

15 A.  We -- I have not done -- I have not conducted an

16 examination for search history on the phone yet.  That'll be

17 part of the forensic examination.

18 Q.  So did I misunderstand you when you were talking at the

19 beginning of direct examination about finding internet searches

20 relating to SAS?

21 A.  Yes.  Yes.

22 Q.  Those were all screenshots?

23 A.  They were screenshots.

24 Q.  So you haven't looked at all --

25 A.  And chats.  Uh-huh.

1  Q.  Okay.  That was related to chats and screenshots?

2  A.  Screen —

3  Q.  So you haven't done any search history at all on the phone?

4  A.  No, ma'am.

5  Q.  All right.

6  A.  Not a forensic search.  All I've done is examine the images

7  contained on the phone.

8  Q.  Okay.  You do acknowledge that screenshots can be made by a

9  phone user, but they can also be texted or sent or messaged by

10  another person who did the search or took the photo and took

11  the screenshot, correct?

12  A.  One more time.

13  Q.  You do acknowledge, with screenshots, that they can be made

14  by a user of a phone, on an iPhone, the two clicks on either

15  side —

16  A.  Right.

17  Q.  — or they can be received by someone through airdropping

18  on an iPhone, through texting, through messaging, through

19  taking screenshots off of somebody else's post, emailing a

20  screenshot, correct?

21  A.  Yes.  Uh-huh.

22  Q.  So there are many ways that screenshots can be received on

23  a phone other than the user of that phone or someone whose

24  hands were around that phone actually making the screenshot,

25  correct?

1  A.  Okay.

2  Q.  Who else used this phone, that you were looking at?

3  A.  Nobody that I'm aware of.  The phone, as I mentioned, as

4  was told to me, was password protected.  And Mr. Velasquez

5  turned the phone over already open.  He opened it himself and

6  handed it to law enforcement.

7  Q.  Okay.  So you're not sure who else used the phone?

8  A.  (Inaudible).

9  Q.  His mother didn't talk to you about passwords?  I mean,

10  actually the passwords linked to any of the many devices you

11  found in the home.

12  A.  I did not ask her for the passwords to the other devices

13  that were hers.

14  Q.  Did you find evidence of domestic violence between

15  Mr. Velasquez's parents in this investigation?

16  A.  No.

17  Q.  Did you record the conversations you had with family

18  members?

19  A.  No, ma'am.

20  Q.  Did any other law enforcement officer record the

21  conversations with family members?

22  A.  Not that I'm aware of.

23  Q.  No body cams or audio recordings?

24  A.  There were body cams present, but I am not aware that those

25  body cams were part of the interview.  They were local law

1  enforcement officers, uniformed officers that were present for

2  purposes of just enabling or allowing the family to see that --

3  just for presence purposes and so that they would not be

4  concerned that we were not, in fact, law enforcement, because

5  we operate in plainclothes.  So we did have uniformed officers

6  present.  Just -- I can't recall if it was SAPD or

7  Bexar County, but uniformed division, and they did have --

8  Q.  Body cams.

9  A.  -- body cams, yes.

10 Q.  But FBI didn't have body cams?

11 A.  No.

12       MR. STEPHENSON:  Your Honor, I object.  There's no

13 relevance to probable cause here.  This isn't a fishing

14 expedition for discovery.

15       THE COURT:  Well, I think she got her answer.  Let's

16 move on.

17 BY MS. ROTH:

18 Q.  Going to the May 2022 tip that FBI received, I just wanted

19 to understand, you talked about a conversation that you alleged

20 occurred between Mr. Velasquez and someone else?

21 A.  Yes.

22 Q.  Was that someone else law enforcement or another individual

23 not law enforcement?

24 A.  I'm very certain it was another individual not law

25 enforcement.

1  Q.  And I'm not going to ask you for the identity, but have

2  officers uncovered the identity of that person?

3  A.  No, not to this –– but we're in the process of doing that.

4  Q.  I want to talk specifically about the residence.  You said

5  that Mr. Velasquez lived in home with his father, mother and

6  12–year–old sister?

7  A.  Yes.

8  Q.  Anybody else living in the house?

9  A.  Not that I'm aware of.

10  Q.  There's no evidence of abuse, physical or sexual, by

11  Mr. Velasquez to any family member; is that correct?

12  A.  By "Mr. Velasquez" are you referring to Alejandro?

13  Q.  Yes.

14  A.  No.

15  Q.  And you talk about texts showing a preference for females

16  13 to 15 years old.

17  A.  Yes.

18  Q.  But the only photos you found, that you allege to be child

19  pornography, were of two– to five–year–olds, correct?

20  A.  Correct.

21  Q.  And there's no evidence of Mr. Velasquez contacting an

22  individual at the elementary school; is that correct?

23  A.  Just the selfie that I –– that I mentioned earlier.

24  Q.  The –– oh.

25  A.  The selfie in front of the school, which is described as

1 "LatinoGroomer Moment," with the children in the background of
2 the elementary school.
3 Q. When you described that, I was imaging that the children
4 depicted did not know they were having a photo taken of them;
5 is that correct?
6 A. That's correct.
7 Q. Okay. So what I'm talking about right now is any evidence
8 of actual contact between Mr. Velasquez, who's -- what? 18
9 years old?
10 A. Yes.
11 Q. -- and anybody under 17.
12 A. There are multiple chats. The solicitation that I
13 testified earlier of Mr. Velasquez --
14 Q. That's the May 2022 incident you were describing?
15 A. Yes.
16 Q. Okay.
17 A. So the solicitation of someone that is indicating that
18 they're not 18 years old yet and they're far away from being 18
19 years old. That is an example.
20    There are multiple chats in which the -- Mr. Velasquez is
21 speaking or texting or chatting with whom he believes are
22 minors, females, being very complimentary to them and kind of
23 following that groomer mentality.
24 Q. And, again, I won't be asking for any identification. But
25 have you identified the people on the other end of the chat?

1    A.  Not yet.

2    Q.  What site were those chats on?

3    A.  I am not 100 percent certain, as they're screenshots.  And

4    sometimes content could be cut out.

5    Q.  These are screenshots of the chats?  So you didn't actually

6    view chats.  You viewed screenshots of chats?

7    A.  Screenshots of chats.  Uh-huh.

8        Another agent whom I have collaborated with very closely,

9    she actually reviewed chats herself.  And she advised me that

10   Mr. Velasquez -- that he indicates in his chats that he has a

11   preference for girls that are 14 and 15, based on the fact that

12   he himself is very young looking.

13       In a chat he indicates that -- so he's very young looking.

14   He's very anxious to get out of his house and live at another

15   location away from his parents where he will not pay rent.

16   That is all part of the same chat or text stream.

17   Q.  And all of these that you're describing are screenshots of

18   chats?

19   A.  Yes.  Screenshots but also actual chats.  What I just

20   described was a chat that was reviewed by another agent.

21   Q.  I'm just a little confused.  Okay?

22   A.  So there's both.  There's -- we have images, screenshots of

23   chats, and there are also chats that were also extracted as

24   part of the image that was extracted from the phone.  And she

25   reviewed those, and I reviewed images.  And so they're both --

1  Q.  Okay.  And who's this "she"?  Is that Jessica Stone or

2  someone else?

3  A.  The case agent, Jessica Stone.  Uh-huh.

4  Q.  So let me just make sure I understand.  The computer

5  forensics are not done, but Jessica Stone reviewed some actual

6  chats, not just screenshots of chats?

7  A.  That's correct.

8  Q.  And those were extracted from a computer or from the phone?

9  A.  From the phone.

10 Q.  But we don't have those here today, correct?  Correct?  You

11 haven't seen those?

12 A.  I have seen the screenshots that I -- that I reviewed.  I

13 have not seen the actual texts --

14 Q.  Okay.

15 A.  -- chats themselves.

16 Q.  And you don't know through what app that --

17 A.  What platform?  No.

18 Q.  Now, speaking of Agent Stone, she mentioned to

19 United States Pretrial Services that there were no aggravating

20 circumstances involving Mr. Velasquez's arrest.  You agree with

21 that?

22 A.  Yes.

23 Q.  You agree that he was very cooperative with law

24 enforcement?

25 A.  I have been told that he was.

1  Q.  You weren't at the scene?

2  A.  No, ma'am.  This is the first time that I've seen

3  Mr. Velasquez.

4  Q.  My remaining questions have to do with the allegation about

5  interstate threats.

6      No firearms were located in the house or on Mr. Velasquez

7  or anywhere in this investigation, correct?

8  A.  No, ma'am.

9  Q.  And you said it was a round-trip ticket purchased from

10  Austin to Florida?

11  A.  Yes, ma'am.

12  Q.  What happened to that ticket?

13  A.  Mr. Velasquez canceled his flight the night before he

14  was -- he was to depart July the 22nd.  He canceled it during

15  the night -- late in the night of the 21st.

16  Q.  How long was the post that you talked about on direct and

17  in the complaint -- how long was that post up?

18  A.  Law enforcement became aware of the post on --

19  Q.  The 19th, right?

20  A.  The 19th.  Yeah.

21  Q.  Okay.  And you said -- you said it was up on the 18th?

22  A.  It was posted the 18th.

23  Q.  Okay.

24  A.  Uh-huh.

25  Q.  When was it taken down?

Freddie Miller – Cross

1  A.  I don't know that it was taken down.  For all I know, it

2  might still be up.

3  Q.  "Still be up"?

4  A.  Yes.

5  Q.  In any event, it was less than 24 hours from the posting to

6  when law enforcement discovered it?

7  A.  Yes.  Approximately.

8  Q.  You talked about the post being known to SAS -- an SAS

9  official?

10  A.  Yes.

11  Q.  And you talked about what appears to be three responses to

12  the post; is that correct?

13  A.  There was responses after that post.  So the post was --

14  Mr. Velasquez placed the post.  And then subsequent to that,

15  there were individuals that started inquiring about the post.

16  They had concerns about the post.

17  Q.  Three, right?

18  A.  There were -- there were a few.  I'd have to take a look at

19  the post itself, if you'll give me a moment.

20  Q.  The complaint on Page 2 shows three.

21  A.  Yes.

22  Q.  In addition to the three posts shown on Page 2 of the

23  complaint, the three responses and the one SAS official who

24  became aware of the post, no one else read the post?

25  A.  Looking at this picture, I see the three responses to the

1  post.  I'm not aware of anyone else that read that post, other

2  than the SAS individuals.  Their social media liaisons

3  obviously read the post.  They saw the post.  And that's why

4  they contacted Tampa Bay police and SAPD both.  So they read

5  the post as well.  So --

6  Q.  Okay.  So maybe -- I said one SAS official because that's

7  what I understood.  But maybe there was more than one SAS

8  official?

9  A.  Possibly.

10  Q.  You don't know?

11  A.  I don't know.  I don't know.

12  Q.  Okay.

13  A.  But what I can say is that this post was not a private

14  post.  It was a post that was in an open Instagram forum.  And

15  that's how various individuals, to include the SAS social media

16  liaison individuals, became aware of it and law enforcement

17  became aware of it as well, because it was in -- it was not a

18  private post.  It was an open --

19  Q.  Okay.

20  A.  -- Instagram post.

21  Q.  Okay.  Do you know the time when SAS officials -- you said

22  when FBI contacted SAS, their officials already knew and had

23  already contacted both SAPD and Tampa police.

24  A.  They had, yes.

25  Q.  Do you know when approximately they found that post?

A.  I don't.  It was -- it was prior -- I know it was prior to
us -- to the FBI contacting them.

Q.  Which was on the 19th?

A.  It would have been in and around the 19th.

Q.  Okay.  What is SAS's ideology?

A.  SAS, the Student Action Summit, is a conservative group,
obviously political.  And the purpose of this conference was to
provide individuals that are like-minded conservatives an
opportunity to hear from a variety of speakers.

Q.  Okay.

A.  What I recall with regards to SAS -- now that you're asking
me this, I recall another meme in which -- and I'm paraphrasing
the meme.  But it said, Secret Service to President Donald
Trump:  We have received a threat from the LatinoZoomer.  Your
speech has now been canceled.

    And so that was in reference to this SAS conference.

Q.  And that was a post by whom?

A.  All I saw was the meme.  It's just a screen capture of the
meme itself.  It wasn't a chat or a text.  It was just the meme
itself.

    Who created the meme, I'm not aware of.  But I do know that
that individual, the LatinoZoomer, was associated with a
perceived threat at the conference directed towards President
Trump.

Q.  President Trump was scheduled to speak at SAS?

1   A.  He was.  He did.

2   Q.  Mr. Velasquez is accused of making -- of threatening

3   interstate communication that is this one post; is that

4   correct?  It's one post that we're talking about?

5   A.  Yes, ma'am.

6   Q.  And you said that you did surveillance as part of this and

7   some research into, I presume, him and other aspects of this

8   case, correct?

9   A.  Yes, ma'am.

10  Q.  You didn't find any direct threat by Mr. Velasquez to

11  another person, correct?

12  A.  The threat that we observed was this -- was this -- a

13  threat to individuals at SAS.  And as you look at the responses

14  to this -- to this post, the -- Mr. Velasquez, the

15  LatinoZoomer, he says, Good afternoon, LatinoZoomer bros.

16  Who's going to SAS?  Asking the question, who's going to be

17  there, who else is going to be in attendance.

18      And that's when this other individual chimes in and says,

19  I've alerted the FBI.

20  Q.  Okay.  And that's -- you're reading from Page 2 of the

21  probable cause affidavit?

22  A.  Yes, ma'am.

23  Q.  So I'm not trying to be technical here.  I'm just trying to

24  understand whether this case is about this particular post or

25  whether there's any other information that you have or believe

1  that Mr. Velasquez did.  In other words, in this case are we

2  talking about this post that you're referencing on Page 2 of

3  the probable cause affidavit?

4  A.  This is the post that initiated our investigation.

5  Q.  Right.

6    And so far have you found any other threat at all, whether

7  it's an in-person threat, a posted threat?  Any other alleged

8  threat?

9      MR. STEPHENSON:  Your Honor, I object.  This is the --

10  part of the complaint.  This is the only threat alleged in the

11  complaint.  Anything outside of that would be outside of the

12  scope of probable cause.

13      MS. ROTH:  It does go to dangerousness.  Maybe the

14  government would be asking this, but I'm interested in knowing

15  before I make an argument to you.

16      THE COURT:  (Inaudible) can answer it.

17      THE WITNESS:  Can you repeat the question, please?

18      MS. ROTH:  Yes.

19  BY MS. ROTH:

20  Q.  Is there any other threat, in all of your investigation

21  that relates in any way to Mr. Velasquez, that you're alleging

22  he might have made, other than the threat that's in the

23  affidavit here and that's alleged in the complaint?

24  A.  What I have observed -- and, of course, everything has to

25  be taken into totality, into context.  What I have observed is

1  Mr. Velasquez's affiliation or inclination towards mass

2  shooters.  I have observed searches for mass shootings that

3  have occurred in '21 -- 2021, 2022.  I take, for example, the

4  most recent, the July 4th parade shooting, searches for that

5  individual.

6      Of course, we've discussed Elliot Rodger.  There's been

7  also searches for the Christchurch shooter.  Also, I can recall

8  four -- I don't know all their names -- but four or five mass

9  shootings that have occurred like within the last few years and

10  Mr. Velasquez researching these individuals.

11      And so when you take everything into context, the totality,

12  that's the behavior, the inclination, the interest that I have

13  been able to observe that leads -- that leans into this initial

14  post.

15  Q.  Yes.

16      I understand your view, and you made that very clear on

17  direct examination as well.

18      But then I'm going to interpret that as an answer of no;

19  that you have found no other evidence of an additional threat

20  in addition to this one that you're alleging, correct?

21  A.  This is the only -- this is the threat that initiated the

22  entire investigation and the only one we've uncovered so far

23  that is a direct threat.

24  Q.  Thank you.

25      You said that agents spoke with Mr. Velasquez.  They

1  recorded that conversation?

2  A.  I am not -- I don't think so.  I am not certain.

3  Q.  Who questioned him?

4  A.  Special Agent Jessica Stone, FBI agent, and Task Force

5  Officer Taylor Davis, an agent assigned to the United States

6  Secret Service, on detail to the JTTF.

7  Q.  You didn't find any -- you said you found numerous

8  electronic devices in the home.  You didn't find anything other

9  than standard issue or readily available laptops, cellphones?

10  No homemade computers, correct?

11  A.  There was a computer that was there, that was in

12  Mr. Velasquez's bedroom, that Mrs. Velasquez indicated that he

13  was building or repairing for her.

14  Q.  "Repairing for her"?

15  A.  Building or repairing for her.  And it was a computer that

16  was not functional at the time.  But she indicated that he was

17  working on the computer.

18  Q.  Okay.  And she identified with that as being hers?

19  A.  She did.  Uh-huh.

20  Q.  Any of the laptops unusual in any way, something that you

21  or I couldn't just go and buy?

22  A.  No.

23  Q.  And the desktop that you seized from Mr. Velasquez, same

24  thing?

25  A.  It didn't appear to me to be like the type -- the type of

1  computer that you would go and buy at a brick and mortar store,

2  like a -- like a Dell or an HP desktop.  To me it looked like

3  something that a gamer would build.

4      I do recall it being -- having a very large case.  And if I

5  remember correctly, it had like an open -- like a window panel

6  that I've seen, that gamers, when they build their own

7  computers or have somebody build for them, that it's specially

8  built to handle, I guess, the gaming -- the power in a computer

9  needed to participate in all these -- the gaming devices,

10  that's the description of the desktop that I saw.

11  Q.  What's the brand name on that?

12  A.  Like I say, it wasn't -- it's not -- to me it didn't appear

13  to be something that you would purchase at a brick and mortar

14  store.  It looked like it was something that somebody put

15  together or built.

16      Let me put it this way.  Way beyond my scope.  And I have

17  been involved in computer crimes for a few years.  So I would

18  not be able to do that.  But I don't recognize it as something

19  you just go up and buy at the store.

20  Q.  Okay.

21  A.  Uh-huh.

22  Q.  Have you ever built a computer?

23  A.  I never have.

24  Q.  I have three questions about incel.

25  A.  Okay.

1  Q.  Was Elliot Rodger the first one to use that term?

2  A.  I don't know.  I know that since the incident with Elliot

3  Rodgers, he has become the incel icon.  And so whenever -- he's

4  become very synonymous with this ideology and this movement.

5  Q.  The way you described it made me think that it's

6  exclusively heterosexual.  Is that true?

7  A.  I believe it mostly is.  My understanding, primarily males,

8  young males frustrated with their inability to have

9  relationships or sexual relations with women, which also -- the

10  ideology also lends itself towards envy towards men as well,

11  men who are able to have these relationships with these women.

12  So it's two pronged.

13  Q.  And then, finally, are they organized exclusively online,

14  or is there no particular organization?

15  A.  I don't believe there to be any specific organization.  At

16  least, I have not -- I have not observed any.

17      What I do know is that this is a movement, an ideology that

18  has, in these recent -- these last years, has gained a

19  momentum, especially in this younger generation, in the social

20  media era.  And in the last few years there have been eight

21  mass casualty events where individuals who self-identified as

22  incels committed acts.  And if I remember correctly,

23  approximately 61 individuals in the last few years have been

24  murdered and victims of incels.

25          MS. ROTH:  I don't have any further questions, Your

1  Honor.

2          THE COURT:  Thank you.

3      Any cleanup, counsel?

4          MR. STEPHENSON:  No redirect, Your Honor.  Thank you.

5          THE COURT:  Okay.  Thank you, sir.  You may step down.

6          MR. STEPHENSON:  Your Honor, I can proffer from the

7  pretrial services report, or I can call the officer.  I don't

8  know if the Court has a preference.

9          THE COURT:  Proffer's just fine with me.

10      Ms. Roth, any --

11          MS. ROTH:  It's also fine with me.

12          THE COURT:  Okay.

13          MR. STEPHENSON:  Thank you, Your Honor.

14      Were the government to call -- the government to call

15  Officer Ramos, she would testify that Agent Stone estimated the

16  defendant's level of sophistication and knowledge with

17  internet-connected devices to be as -- a nine out of ten on a

18  scale of one to ten.

19      Pretrial services did deem Mr. Velasquez -- I believe

20  that's a reference to Mr. Velasquez's father -- as a suitable

21  third party custodian.  But U.S. pretrial services does not

22  deem Mrs. Velasquez a suitable third party custodian.

23      Additionally, the residence, referring to Mr. Velasquez's

24  residence, is located on an adjacent street, near Candlewood

25  Elementary and Candlewood Clubhouse for boys and girls.  If

allowed to reside in this home, the defendant must pass the
school and club upon entering and exiting the residential
neighborhood.  U.S. pretrial services does not assess the
residence as suitable.

The defendant's parents did not present any alternative
addresses should the defendant be released on bond.  Therefore,
a suitable residence has not been provided and/or assessed by
U.S. pretrial services.

And then, finally, Your Honor, the recommendation from
pretrial services that there is no condition or combination of
conditions that will reasonably assure the appearance of the
defendant as required and the safety of the community.

THE COURT:  Okay.  Thank you.  That's the government's
case, I take it?

MR. STEPHENSON:  That is, Your Honor.

THE COURT:  Okay.  Ms. Roth, any evidence that you'd
like to introduce to inform either of these two issues?

MS. ROTH:  Not at this time, Your Honor.

THE COURT:  Okay.  And would you like to be heard in
argument on probable cause, Ms. Roth?

MS. ROTH:  If Your Honor finds probable cause, then
I'd like to argue about the bond conditions, Your Honor.

THE COURT:  Okay.  But you don't want to argue
probable cause?

MS. ROTH:  No, Your Honor.

1       THE COURT:  Okay.  All right.  Well, let me just

2 initially then establish for the record that the evidence

3 establishes probable cause to believe an offense has been

4 committed and that the defendant committed the offense.  Based

5 on the credible and reliable testimony that you heard here,

6 there's probable cause with respect to each of the two charged

7 offenses.

8       MS. ROTH:  Your Honor, are they doing work on the —

9       THE COURT:  I think — I think that is construction

10 sounds that we're hearing.  Hopefully that'll cease.  We'll

11 figure out what's going on.  I think the security's looking at

12 it.

13    With respect to the 875(c) charge, there was evidence of a

14 transmission of a communication containing a threat to injure

15 the person of another.  And with respect to the other charge,

16 there is sufficient evidence to establish probable cause that

17 the defendant knowingly possessed items containing images of

18 child pornography; that the material was produced using

19 materials that had been used or in or affecting interstate

20 commerce, including by a computer or a cellphone; and that the

21 defendant, when he possessed the material, knew the material

22 was pornography.

23    It is a totality of the circumstances determination, as is

24 probable cause.  And that informs these elements, in

25 particular, with respect to the second offense.  The evidence

about the grooming activities and the other selfies and other
material like that informs, in particular, that third element
regarding knowledge.

With that, I'm going to order, Mr. Velasquez, that you
appear for further proceedings in the district court. I think
I referred to you as Mr. Gomez earlier. And I apologize if you
prefer to go by Mr. Velasquez.

With that, the evidence -- or the issue that's now before
the Court is the issue of detention. We've heard the evidence
informing the detention question. Let me just explain for you,
Mr. Velasquez, briefly what the Court's looking at here.
There's a statute that's called the Bail Reform Act. That's
the statute that governs whether and to what extent somebody
can be released on bond pending their trial on charges.

The defendant, you, are entitled to the presumption of
innocence on those underlying charges. And nothing that takes
place in this hearing should be construed to affect that
presumption. That said, the Court takes into evidence, that
informs four factors that the Bail Reform Act provides for the
Court to consider. And those are the nature and circumstances
of the alleged offense, the weight of the evidence against the
defendant, the history and characteristics of the defendant and
the nature and seriousness of the danger to others or the
community.

In this case there is a rebuttable presumption that's in

place because of the nature of the child pornography charge
involving a minor victim.  That presumption means that there's
a rebuttable presumption that no condition or combination of
conditions will reasonably assure the appearance of the
defendant and the safety of the community.  The presumption can
be rebutted by the defendant producing some credible evidence
to rebut it.

    With that, Mr. Stephenson, why don't I open it up to the
government for argument and further elaboration or
clarification or anything that I've just said.

        MR. STEPHENSON:  Thank you, Your Honor.

    The government's argument for detention is focused on
dangerousness to the community, and particularly the child
pornography charges.  I don't -- I don't dispute the pretrial
services issues with flight risk.  It's just not the focus of
my argument.

    So with that in mind, I'd like to focus on -- I think the
government adduced ample evidence that the defendant has child
pornography on his phone.  That is obviously a very serious
charge, with great implications for the victims who are
exploited for child pornography.  And particularly in light of
the additional grooming activities that the government brought
to light through Officer -- Agent Miller's testimony and his
proximity to the school, not only his physical proximity but
his -- the selfie that was described with the school in the

background -- his self-described status as a groomer; and that
he has apparently not just self-described himself as a groomer,
but he's taken actions in furtherance of that, referring to the
complaint prior this year where he seems to have engaged in a
chat where he had a picture of his genitals exposed to somebody
who identified to him as a minor.

To me, those -- that amounts to -- that shows an extreme
dangerousness to the community, one where the resulting harm to
victims is extremely great.  And severity of the crime and the
ample evidence that we've given of his dangerousness to the
community mitigate for detention in this case.

THE COURT:  Thank you, counsel.

Ms. Roth.

MS. ROTH:  Thank you, Your Honor.

First, flight should not be considered an issue here.  And
the pretrial -- I object to the pretrial services three reasons
for listing flight as an issue.  The offense charged does not
raise any concern about flight by Mr. Velasquez were you to
order him released on bond.

The unsuitable living situation is deemed by pretrial
because of its proximity to the elementary school discussed.
But there are other places where he could be, including halfway
house.  And even if he were to return to his parents' home, he
could be placed on electronic monitor, for instance, that would
be more than sufficient to address both the danger raised --

1   the issues raised by the government and any flight concerns.

2      But the housing situation itself is where he's been,

3   including for the approximately two weeks between the time that

4   the evidence discussed today was found by law enforcement and

5   Mr. Velasquez's arrest.

6      MR. STEPHENSON:  Your Honor, I object to that.  That's

7   not true, and it's not in the record.

8      MS. ROTH:  Well, it's obvious from the PACER, frankly.

9      But in any respect, he's been there this whole time.  So

10   he's been there, and there's just not a flight issue.

11      Regarding danger, you heard from the witness that the only

12   threats alleged by Mr. Velasquez is the post that's at issue

13   here.  And that's after extensive investigation of him for a

14   month, for several weeks in July.  The review of his

15   electronics, discussions with family members, surveillance work

16   with Tampa police and San Antonio police.  And so we know that

17   we're dealing with one threat that was an Instagram post.

18   That's not belittling this serious threat that he's accused of.

19   But we don't see other threatening behavior from this

20   18-year-old man.

21      And so the danger that the government raises can be

22   addressed by ordering sex offender treatment, by ordering

23   electronic monitor and perhaps even personal counseling, which

24   is raised through some of the testimony that we heard today and

25   some of the items listed in the complaint, including

1  Mr. Velasquez's mother's concern that he has an addiction to
2  the internet and to electronic devices.

3      And so while the government's argument is based on the
4  evidence that was solicited from the witness today, it doesn't
5  rise to what Your Honor could not form conditions for.  And I'm
6  asking that Your Honor release him on bond to his parents'
7  home.

8      The significance there is that his father talked
9  extensively with pretrial and agreed to be both a third party
10 custodian and a surety, and extensively discusses his
11 willingness to do that on Page 2 of the pretrial services
12 report.  Pretrial found him suitable as a third party
13 custodian.

14     They mentioned that his mother is also willing to serve in
15 that capacity, but they did not deem her to be suitable.  His
16 parents both reside in the home, and his father is deemed
17 suitable and is also -- both of them are willing.

18     So the parents speaking with pretrial services, the ability
19 to place an electronic device restriction or ban even, although
20 I'm not asking for that, but a restriction and monitoring of
21 electronic device use and also electronic monitoring of
22 Mr. Velasquez more than meets the concerns that are set forth
23 in the government's argument.

24     So we're requesting that bond, Your Honor.

25          THE COURT:  Okay.  First, addressing the presumption,

I find the defendant has presented evidence sufficient to rebut
the presumption, including, well, just the proposals that
Ms. Roth just outlined:  The possibility of a suitable third
party custodian, monitoring, other restrictions to foreclose
internet access.  All of that's sufficient to rebut the
presumption.

That means then that the Court is directed to consider
those four factors and evaluate whether a bond or release on
bond would be appropriate in the case.  The government has the
burden with respect to dangerousness to demonstrate by clear
and convincing evidence that there are no conditions or
combinations of conditions that the Court could impose to
reasonably assure the safety and -- of any person or the
community.

And, really, that's the emphasis here, is that this is a
totality of the circumstances inquiry here.  These are two --
taken individually, these are two extremely serious charges
involving alleged conduct that is deeply concerning.

With respect to the pornography charge, there was evidence
today of communications, solicitation of actual contact or
interaction with somebody who identified as a minor.  There's
an elementary school in close proximity.  There's no proposed
location for supervision that's suitable to pretrial services,
even though there is a custodian.  And there is just, frankly,
in all of the evidence, the totality of the evidence, a pattern

of sort of nihilistic behavior or ideology that just reflects

an extremely concerning likelihood that conditions could or

would be ignored or circumvented, given the nature of the

stakes, particularly on the -- on the pornography issue, but

also with respect to these threats.

Again, the charge here is -- the 875 charge is a charge

relating to the threat, not to any actual violence undertaken.

But just given, again, the totality of evidence here, the

picture painted is one that's deeply concerning and one in

which there are just no set of conditions that would reasonably

assure the safety of the community.

So I'm going to order that the defendant be detained due to

a danger to the community.  The government has met its burden

to show by clear and convincing evidence that danger is

presented.

Anything further, Mr. Stephenson?

MR. STEPHENSON:  Nothing further, Your Honor.  Thank

you.

THE COURT:  Thank you, sir.

Ms. Roth, anything further from you?

MS. ROTH:  No, Your Honor.  Thank you.

THE COURT:  Okay.  That's all that I have.  We'll go

off the record.  Actually, I'll step off briefly.  But we've

got another hearing, so I'll be back shortly.

*(12:03 p.m.)*

-oOo-

I, court approved transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Date:   9/11/2022      /s/ Chris Poage
                       Approved Transcriber